# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:08cv614-RJC-DSC

| | |
|---|---|
| RONALD CARTER & <br> REVOLUTIONARY CONCEPTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EMMANUEL OZOENEH & <br> JOHN DOES NOS. 1 THROUGH 7, <br><br> Defendants. | ORDER |

**THIS MATTER** is before the Court on the plaintiffs' motion for partial summary judgment on inventorship and the related briefs (Doc. Nos. 25, 26, & 27), as well as the attorneys' arguments at the hearing conducted on May 12, 2010. The matter is now ripe for the Court's determination.

## I. BACKGROUND

The invention at issue is U.S. Patent No. 7,193,644 ("the '644 patent"), on which plaintiff Ronald Carter is named as the sole inventor. The '644 patent involves "an audio-video communication and answering system that synergistically improves communication between an exterior and an interior of a business or residence and a remote location, enables messages to be stored and accessed from both locally and remotely, and enables viewing, listening, and recording from a remote location." (Doc. No. 1-1 at 2). Carter began working on the concept that became the '644 patent as early as 1988. In about 1988, Carter retained Invention Submission Corporation, a self-help invention company, to evaluate his ideas. By May 1998, a document labeled "New Product Idea . . . " had been produced that identified a number of the features of the invention that was initially disclosed to the Dougherty & Clements law firm ("the Law Firm") in 2002.

Carter met defendant Emmanuel Ozoeneh in early 2002, when Carter was a customer at the electronics store where Ozoeneh worked. After speaking about Carter's ideas, the two formed Revolutionary Engineering Concepts, Inc. ("REC"), to act as a vehicle to develop and commercialize the invention. Soon after, still in early 2002, they hired the Law Firm to pursue a patent. After subsequent meetings and exchanges between Carter and Ozoeneh (on behalf of REC) and the Law Firm, attorney Jason S. Miller filed a provisional patent application on October 15, 2002, listing both Carter and Ozoeneh as co-inventors.

Several months later, Carter and Ozoeneh met to discuss the progress of invention, and Carter told Ozoeneh that the Law Firm had informed him the invention was not patentable.[1] Thereafter, Carter and Ozoeneh had little or no contact. Soon after this meeting, Carter and others formed Revolutionary Concepts, Inc. ("RCI"). Then, in October 2003, the Law Firm filed U.S. Patent Application No. 10/682,185 ("the non-provisional application") with the United States Patent and Trademark Office on behalf of Carter and without Ozoeneh's knowledge.[2] The non-provisional application eventually matured into the '644 patent, which lists the only inventor as Carter.

Some time thereafter, Carter and RCI filed suit against the Law Firm in state court, alleging malpractice in damaging Carter's and RCI's foreign patent rights by negligently failing to file timely foreign patent applications. That action is currently pending in Mecklenburg County Superior Court. Pertinent to this action, Carter claims that at some point after the state-court litigation ensued, Ozoeneh began making public statements asserting that he is the co-inventor or the sole

---

[1] There is some evidence that both Carter and Ozoeneh received the same letter from the Law Firm, which Carter reads as stating the invention in the provisional application was not patentable. The Court resolves this conflict in favor of the nonmovant, Ozoeneh, at the summary judgment stage.

[2] After the Law Firm's efforts did not result in a patent, Carter hired Tillman Wright PLLC to take over the application.

2

inventor of the '644 patent's subject matter. Additionally, Ozoeneh retained counsel, who informed plaintiffs' counsel of Ozoeneh's intention to sue Carter and RCI on the basis of Ozoeneh's claim of inventorship.

On December 30, 2008, Carter and RCI filed the Complaint in this action against Ozoeneh and seven John Doe defendants seeking declaratory, compensatory, and injunctive relief with respect to the inventorship and ownership of the '644 Patent.[3] Specifically, plaintiffs seek a declaratory judgment to the effect that Ozoeneh is not an inventor or owner of the technology that is the subject of the '644 Patent.[4]

Ozoeneh presents various forms of evidence in support of his claim that he should have been named a co-inventor of the '644 patent.

**A. Ozoeneh's own testimony**

Ozoeneh offers personal testimony that he is an inventor of the subject matter of the '644 patent. He claims, according to his answer to plaintiffs Interrogatory No. 1, that he is the "sole or joint inventor" of all of the limitations of claims 1, 3, 4, 7, 8, 10, 12-15, 17, 18, 20, 22-24, and 26-30, and of the exterior module in claim 6. (Doc. No. 25-7 at 5-6).

Carter's counsel questioned Ozoeneh at deposition, asking him whether certain features of the '644 patent's invention were his ideas. In response to these questions, Ozoeneh claimed the following features of the invention were his ideas alone: having a computer and software to control the unit, making the device communicable with a mobile phone, a motion sensor, a camera, and a device for keeping a record of visitors. Carter offers a May 1998 document, created at his direction

---

[3] The Court dismissed all claims against the John Doe defendants in the Order dated March 8, 2010.

[4] The plaintiffs also assert other claims, and Ozoeneh asserts counterclaims, that are not the subject of this motion and are not discussed here.

3

four years before Carter and Ozoeneh met. This document is a revision of an earlier Invention Submission Corporation document, disclosing many of the features Ozoeneh claims were his ideas. Specifically, the May 1998 document discloses that the device (1) keeps a record of visitors, (2) has a video feed that permits remote viewing, (3) features two-way remote audio, (4) sends transmissions to a remote phone service (the drawing shows a wireless telephone), (5) is controlled by software via a PC, (6) contains a motion sensor, and (7) includes a camera. (Doc. No. 25-3).

### B. Drawing of prototype

Ozoeneh provides as evidence a copy of a fax addressed to Jason Miller, and listing "Emmanuel, Revolutonary Engineering Concepts" as the sender. (Doc. No. 26-2). The fax is dated May 23, 2002. The document contains a drawing of a purported prototype with specific parts labeled, including a digital video camera, a microphone, a speaker, a keypad, a phone jack, a video screen, and a head phone jack. Short narratives describe some of the labeled features.

### C. Deposition testimony of Christopher Bernard

Ozoeneh offers portions of the Rule 30(b)(6) deposition of Christopher Bernard, an attorney with the Law Firm at the time of the relevant events. Bernard stated in the deposition that the firm's documents and invoices are "consistent with" Ozoeneh's position that he was an inventor of the Invention. Bernard further stated that the "firm's position was that it appears he was an inventor."

### D. Law Firm documents

Ozoeneh provides an invention disclosure form that Carter and Ozoeneh submitted to the Law Firm, on which Carter and Ozoeneh each signed the form on adjacent lines listing them as "Inventor 1" and "Inventor 2." (Doc. No. 11-4 at 6). He further provides a copy of a "new matter report" from the Law Firm listing "Doorbell Messenger" as the file name. This report lists both Carter and Ozoeneh as clients. It lists the nature of the matter as "1) Work for Hire Agreement . . .

2) Provisional Pat Appln." (Doc. No. 26-5 at 2). Ozoeneh also offers a file cover jacket labeled "Door Answering System" listing both Carter and Ozoeneh on the line for "Inventor(s)." (Doc. No. 26-6). Further, handwritten notes from the Law Firm's file include the following notation:



(Doc. No. 26-7). The notation appears to indicate that the note-taker considered both Carter and Ozoeneh co-inventors. Attorney Miller stated at deposition that the notes were his. Finally, Ozoeneh provides letters and invoices from the Law Firm addressed to Ozoeneh, most of which were also copied to Carter. These communications include an October 22, 2002, letter to Ozoeneh, attached to which were an invoice and the provisional application that was filed listing both Carter and Ozoeneh as inventors. Carter is listed as having been carbon copied on this letter.

### E. Expert report from state court litigation

Ozoeneh provides as evidence the supplemental expert report from the state-court litigation of Karl Sawyer, Jr., a patent attorney. One portion of this report states:

> I attended a deposition of Mr. Ozoeneh taken under oath, at which Mr. Ozoeneh gave testimony to the effect that he, not Mr. Carter, is the sole inventor of the subject matter in the United States patent application in question. Subsequently, I have received and reviewed a copy of the transcript of such testimony and, in my opinion, Mr. Ozoeneh's testimony establishes that he is the sole inventor of such invention.

(Doc. No. 26-9 at 5).

### F. Affidavit and deposition testimony of Jason Miller

Ozoeneh also offers the affidavit and deposition testimony of Jason Miller, the attorney who

drafted and filed the provisional application. Miller states in the affidavit that he believes Ozoeneh and Carter were co-inventors based on (1) his review of documents provided by Carter and Ozoeneh; (2) his discussions with the two; and (3) his discussions with his supervisor, Ralph Dougherty.

At deposition, when asked why his notes look to reflect that Carter and Ozoeneh were co-inventors, Miller stated, "at the time these [notes] were taken, that was my understanding." (Doc. No. 45-2 at 5). Miller stated that this understanding was based on "discussions with Mr. Carter and Mr. Ozoeneh." (Id.). Miller stated later in the deposition, "I do believe that based upon the conversations that I had with Mr. Carter and Mr. Ozoeneh, the documents provided to me, and the Invention Disclosure Form, they both contributed to [Claim 1] as a whole." (Id. at 8). The questioning then goes on:

> Q. . . . you remember those contributions as we sit here today?
>
> A. I didn't say I understood specific claim elements. I said I do not recall any specific discussions that I had.
>
> Q. So, sitting here today, are you basing your opinion that Ozoeneh contributed to Claim 1 . . . based solely on the fact that you put him on [the provisional application] eight years ago?
>
> A. I'm basing my belief that Ozoeneh and Carter are co-inventors based upon what is contained in the notes, the conversations that I had with Mr. Carter, and the fact that they were both named as co-inventors.
>
> Q. Is there anything else you're basing it on?
>
> A. The fact that neither Mr. Ozoeneh nor Mr. Carter ever objected to the fact after being provided copies of the Provisional Application as filed.

(Doc. No. 45-2 at 8).

### G. Deposition testimony of Carter

In addition, Ozoeneh offers testimony from depositions of Carter conducted on April 12,

6

2007, and March 4, 2010.[5] The April 12, 2007, testimony from the state-court action includes an exchange where Carter is asked how RF capacity works. The questioner states, "I know it's Radio Frequency, but I don't have a clue as to how that works." Carter responds, "And neither do I." The questioning continues:

> Q. . . . what brings RF capacity to a product? Is it in a box or is it in a --
>
> A. I'm not sure.
>
> Q. You don't know?
>
> A. (witness shakes head negatively.)

(Doc. No. 45-3 at 4).

In addition, Ozoeneh provides excerpts from the deposition of Carter taken on March 4, 2010, in this action. Carter testified that he believed the provisional application as filed was not patentable but that the non-provisional application was patentable. When asked to explain what specifically differentiated the non-provisional application from the provisional one, Carter responded: "We included a GUI interface with a handheld device." (Doc. No. 45-4 at 10). He further stated, "We added a processor to the camera unit to give the camera unit smart technology, smart processing capability. Those are the primary two, right off the top of my head . . . ." (Id.). Carter was further questioned on the issue and was asked "And that's all you have?" (Id.). He responded, "I think that was pretty significant." (Id.).

## II. LEGAL STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[5] Ozoeneh additionally offers a letter from his counsel to opposing counsel calling into question the appropriateness of the current motion for summary judgment. The Court does not consider this evidence.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a ge0nuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. Standard for inventorship

"There is a presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence." Fina Oil and Chem. Co. v. Ewen, 123 F.3d 1466, 1472 (Fed. Cir. 1997) (citations omitted). "Although an exact definition

8

is elusive, 'clear and convincing evidence' has been described as evidence that 'place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable.' Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1360 (Fed. Cir. 2007) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)). Further, the "general rule is that a party alleging misjoinder or non-joinder of inventors . . . must provide evidence to corroborate the alleged joint inventor's conception." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004). Thus an alleged co-inventor may not prove his contribution to the conception by his own testimony and nothing more. See Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1327 (Fed. Cir. 2004).

Rather, the putative inventor's testimony must be corroborated by other evidence. See id. This other evidence may take various forms, such as: contemporaneous documents prepared by a putative inventor, circumstantial evidence about the inventive process, and oral testimony of someone other than the alleged inventor. Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456 (Fed. Cir. 1998). Further, while it may take many forms, corroborative evidence must identify the actual contribution a putative inventor made to a specific claim or limitation at issue. See Gemstar-TV Guide International, Inc. v. International Trade Commission, 383 F.3d 1352, 1382 (Fed. Cir. 2004) (holding evidence failing to explicitly identify putative inventor's contributions did not sufficiently corroborate). "Whether the inventor's testimony has been sufficiently corroborated is evaluated under a 'rule of reason' analysis," where "an evaluation of all pertinent evidence must be made so that a sound determination of the credibility" of the putative inventor's story may be reached. Trovan v. Sokymat, 299 F.3d 1292, 1302 (Fed. Cir. 2002).

While a court should take into account the clear-and-convincing standard of proof when determining a motion for summary judgment, it "by no means authorizes trial on affidavits."

Burroughs Wellcome, Co. v. Barr Laboratories, 828 F. Supp. 1200, 1204 (E.D.N.C. 1993) (quoting Anderson, 477 U.S. at 255). This is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Id. (quoting Anderson, 477 U.S. at 255).

"Inventorship is a question of law with underlying factual issues." Checkpoint Sys., Inc. v. All-Tag Sec. S.A., 412 F.3d 1331, 1338 (Fed. Cir. 2005) (citation omitted). "The key to determining inventorship is conception." Burroughs Wellcome, 828 F. Supp. at 1205. Conception has been defined as "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." Thone-Poulenc Agro, S.A. v. Monsanto Co., 445 F. Supp. 2d 531, 547 (M.D.N.C. 2006) (citing Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986)). At the same time, an inventor "need not alone conceive of the entire invention, for this would obviate the concept of joint inventorship." Id. at 547.

### B. Whether Carter is the sole inventor

This inquiry turns on whether Ozoeneh has provided sufficient corroborative evidence in support of his claims. The Court begins with the presumption that Carter is the sole inventor of the '644 patent. See Fina, 123 F.3d at 1472. Ozoeneh has provided extensive corroborative evidence as to his general claim that he is a co-inventor, including multiple documents from the Law Firm, the testimony of Miller, and the provisional application listing him as a co-inventor. Carter's claim of sole inventorship thus raises questions. How could Carter and Ozoeneh go through all the initial steps with the Law Firm, from the May 3, 2002, new matter report through the October 15, 2002, filing of the provisional application, and allow their inventorship status to be unclear to the Law

Firm? If Carter is in fact the sole inventor, would he not at some point have indicated this important fact to the Law Firm, making clear that Ozoeneh was simply an investor interested in the progress of REC, as Carter argues now? It seems a law firm experienced in handling such matters would make sure they have the story clear before filing a provisional patent application.

That the Law Firm considered Carter and Ozoeneh co-inventors, while it does not speak to a specific claim of the patent, tends to corroborate Ozoeneh's testimony that he was a co-inventor. The naming of Ozoeneh as co-inventor on the provisional application likewise tends to corroborate Ozoeneh's testimony. Still, the Bernard Deposition, the extensive Law Firm documents and notes, the report of Sawyer, and the Miller testimony all have one thing in common – they generally speak of Ozoeneh as either a co-inventor or the sole inventor, but they fail to provide information as to a specific claim or limitation.

One comparable case may be Gemstar-TV Guide International, Inc. v. International Trade Commission, where a putative inventor attempted to corroborate his testimony with two product disclosure documents. 383 F.3d 1352, 1382 (Fed. Cir. 2004). While the product disclosure documents contained an annotation listing him by name, they "did not explicitly state what subject matter [he] contributed." Id. at 1382-83. The Court held that because they failed to explicitly identify the putative inventor's contributions, these documents "fail[ed] to show that [his] contributions . . . were part of the invention claimed" in the patent at issue. Id. The court further noted that the putative inventor's "own testimony cannot fill in these gaps in the [corroborative evidence] to establish whether [he] contributed to the subject matter of the invention claimed in the . . . patent." Id. In this matter, the Bernard Deposition, the Law Firm documents and notes, and the report of Sawyer similarly fail to explicitly identify Ozoeneh's contributions, if any, to the '644 patent. Because of this failure, they are insufficient to corroborate Ozoeneh's testimony.

11

The Miller affidavit and deposition may marginally corroborate Ozoeneh's testimony. Miller's affidavit states that he believes Ozoeneh and Carter were co-inventors based on (1) his review of documents provided by Carter and Ozoeneh; (2) his discussions with the two; and (3) his discussions with his supervisor, Ralph Dougherty. There is nothing claim-specific about this statement. His deposition testimony, however, does speak to Claim 1. Miller states in the deposition, "I do believe that based upon the conversations that I had with Mr. Carter and Mr. Ozoeneh, the documents provided to me, and the Invention Disclosure Form, they both contributed to [Claim 1] as a whole." When asked specifically on what he bases his belief that Ozoeneh contributed to Claim 1, Miller specified three items: (1) "what is contained in the notes"; (2) "the conversations that [he] had with Mr. Carter"; and (3) "the fact that they were both named as co-inventors." The notes contain nothing regarding a specific claim or limitation, and Miller points to no specific conversation with Carter or Ozoeneh concerning particular claims or limitations. Further, Miller's general assumption now that they are co-inventors simply because they were both named on the provisional application also fails to point to a specific claim or limitation. Therefore, Miller's opinion that Ozoeneh is a co-inventor fails to sufficiently corroborate Ozoeneh's testimony.

Ozoeneh claims Carter's deposition testimony from the state-court action calls into question his depth of knowledge regarding the technology behind the '644 patent. When asked about RF capacity, Carter responded that he did not know what brings RF capacity to a product or how it works. However, RF capacity is a term that is found nowhere in the '644 patent, and thus its relevance to Carter's understanding of the '644 patent is marginal at best. Further, in his March 4, 2010, deposition in this action, Carter named only two items that differentiate the '644 patent from the provisional application. A sole inventor's lack of technical expertise may corroborate another's claim of co-inventorship. See Symantec Corp., 522 F.3d at 1296 ("This case is thus distinguishable

12

from *Ethicon*, where we held that a *sole* inventor's lack of technical expertise corroborated another's claim of coinventorship." (emphasis in original)) (citing Ethicon, 135 F.3d at 1464-65). Thus a true lack of expertise in the subject matter of the '644 patent on the part of Carter would constitute evidence that he is not the sole inventor. However, this single admission of a lack of understanding of technology not explicitly named in the '644 patent, taken out of context from a deposition in the state-court litigation, holds little weight on its own.[6] Further, the Court is not convinced that the two items Carter named as differentiating the provisional application from the '644 patent are insignificant, or that they show a lack of expertise. Carter's deposition testimony fails to corroborate Ozoeneh's claims, especially as to any specific claim or limitation of the '644 patent.

The fax of the purported diagram of the invention is in another category of evidence, however. Carter argues that this drawing proves little more than that Ozoeneh sent the Law Firm a fax of a drawing. The Court notes that there is no specific evidence that Ozoeneh conceived of the drawing at issue. Further, the faxed drawing is strikingly similar to the drawings in Carter's invention description from May 1998, nearly four years before Carter and Ozoeneh ever met. Carter relies on Applied Elastometrics, Inc. v. Z-Man Fishing Products, Inc. in arguing for summary judgment. 521 F. Supp. 2d 1031 (N.D. Cal. 2007). There, the putative inventor submitted as corroboration a declaration of an individual who stated she overheard him "'describing and explaining essential characteristics'" of the claims at issue. Id. at 1042. Such evidence on its own failed to corroborate the putative inventor's testimony, because the declaration "[did] not identify

---

[6] In addition, there is evidence that Carter received help with the design of the invention from Mark Tofano, an electronics designer, in order to implement Carter's conception. (Doc. No. 25-11). Carter could thus still be the sole inventor but not necessarily be expert in every last element of the technology at issue. This is because "[t]he basic exercise of the normal skill expected of one skilled in the art, without an inventive act, . . . does not make one a joint inventor. Therefore, a person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known and the current state of the art." Fina, 123 F.3d at 1473.

13

the claims to which [he] contributed." Id.; Cf. Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1296 (Fed. Cir. 2008) (holding inventor's call log book describing technical conversation with putative inventor insufficient because failed to explicitly identify a contribution by putative inventor to the patent's claims). The faxed drawing in this case may be compared to the declaration in Applied Elastometrics, as the faxed drawing does not identify the claims to which Ozoeneh personally contributed. But unlike the declaration in Applied Elastometrics, which is not binding on this Court, the faxed drawing here is not the only circumstantial corroborative evidence.

Ozoeneh was specifically listed as a co-inventor on the provisional application. This application contains specific language describing much of what would become the claims and limitations of the '644 patent. While Carter's testimony differentiates the '644 patent from the provisional application, it does not foreclose the possibility that if Ozoeneh contributed to the subject matter of the provisional application, then some of Ozoeneh's same contributions became claims or limitations of the '644 patent. This evidence, while it does not spell out the specific claims to which Ozoeneh contributed, provides enough for a jury to determine that he was a co-inventor. Of course further evidence may be required regarding what specific claims or limitations may have been conceived by Ozoeneh. Still, the fact alone that Ozoeneh was named as a co-inventor on the provisional application may be enough to allow a reasonable jury to find by clear and convincing evidence that he was a co-inventor of the '644 patent. But the Court need not decide this question, because there is significant additional circumstantial evidence of co-inventorship in the disclosure form signed by both Carter and Ozoeneh, the faxed diagram, the Miller testimony, and the Law Firm's notes. At some point, the sheer quantity of evidence of co-inventorship, while none explicitly discloses to which claims the putative co-inventor contributed, may be enough for a jury to find that the testimony is corroborated. Looking at all the available evidence, the Court finds

14

under the rule of reason that a rational trier of fact could find by clear and convincing evidence that Ozoeneh was a co-inventor of the '644 patent.[7]

At oral argument, the parties discussed the level of significance of Carter's allowing Ozoeneh to be named as a co-inventor on the provisional application. The evidence reflects that Carter, at a point in time, allowed the Law Firm to believe that Ozoeneh was a co-inventor.[8] Ozoeneh's name appears as co-inventor in Miller's notes, and Ozoeneh signed his name directly beneath Carter's on the line for "Inventor 2," on the invention disclosure form. Further, there is no evidence of Carter having objected to Ozoeneh being named as co-inventor on the provisional application. At argument, Carter's attorney offered two potential reasons for Carter's seeming acquiescence in Ozoeneh's being named as co-inventor on the invention disclosure form and provisional application: (1) Carter simply didn't understand the legal requirements or significance of the term "inventor"; and (2) the invention disclosure form was simply a form that they filled out, and Carter was not thinking that Ozoeneh's signing the form on the "Inventor 2" line had any real significance. These two assertions, while they may well be true, represent quintessential jury questions, rather than ones to be resolved by a judge at the summary judgment stage.[9]

---

[7] Ordinarily, the Court would first construe the contested claims of the '644 patent before engaging in inventorship analysis. This is because a "proper inventorship analysis begins with a common understanding of the meaning of the claim terms and then proceeds to a factual inquiry regarding the specific fact issues." See Trovan, 299 F.3d at 1307 n.1 (emphasis in original) ("Because the district court and the parties began with an erroneous legal backdrop, the resulting fact-finding in this case is inconclusive."). However, the parties have not briefed the Court as to specific claims, nor have they disputed the meaning of specific claims.

[8] Whether Carter actually asserted Ozoeneh was a co-inventor, or whether Carter simply stood silent in the face of this important assumption on the part of all parties involved, makes little difference to the inquiry.

[9] The parties also discussed the April 29, 2010 deposition of Jason Miller, a transcript of which was only provided to the Court at the oral arguments conducted on May 12, 2010. Miller testified that he could not recall whether he or a colleague ever informed Carter of the standard for what makes a person an inventor. However, Miller did testify that Ralph Dougherty, the partner who conducted Carter and Ozoeneh's initial client consultation, would in such a meeting "[t]ypically . . . walk through . . . what is required to be an inventor on a patent . . . ." (Deposition of Jason Miller, Apr. 29, 2010, at 41) (on file with the Court). This, too, involves just the type of factual question that is reserved for a jury.

Carter's counsel at oral argument noted there is simply no "red meat" in any of the circumstantial evidence Ozoeneh has offered, a line of attack reminiscent of the 80s-era Wendy's commercial where the elderly women inquire: "Where's the beef?" The question shall remain unanswered at this stage. Whether the menu selection is vegetarian is subject to jury determination. The Court does not decide today that Ozoeneh is a co-inventor of the '644 patent. Nor is the Court suggesting that Ozoeneh has a strong case. Rather, the Court is simply holding that there are material issues of fact on which a reasonable jury, under the clear and convincing standard, could find in favor of Ozoeneh.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that the plaintiffs' motion for summary judgment is **DENIED**.

**SO ORDERED.**

Signed: May 13, 2010

_____
Robert J. Conrad, Jr.
Chief United States District Judge