UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cv614-RJC-DSC

| RONALD CARTER & | ) |
| REVOLUTIONARY CONCEPTS, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) ORDER |
| EMMANUEL OZOENEH, | ) |
| LAWYERS MUTUAL LIABILITY CO. | ) |
| OF NORTH CAROLINA, & | ) |
| JASON MILLER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THIS MATTER** is before the Court on motions for summary judgment by defendants Lawyers Mutual (Doc. No. 51), Jason Miller (Doc. No. 53), and Emmanuel Ozoeneh (Doc. No. 55). For the reasons set forth below, the Court will grant each defendant's respective motion.

**I.  BACKGROUND**

This litigation centers around the invention disclosed in U.S. Patent No. 7,193,644 ("the '644 patent"), on which plaintiff Ronald Carter is named as the sole inventor. The '644 patent involves "an audio-video communication and answering system that synergistically improves communication between an exterior and an interior of a business or residence and a remote location, enables messages to be stored and accessed from both locally and remotely, and enables viewing, listening, and recording from a remote location." (Doc. No. 1-1 at 2). Carter began working on the concept that became the '644 patent as early as 1988. In about 1988, Carter retained Invention Submission Corporation, a self-help invention company, to evaluate his ideas. By May 1998, a document labeled "New Product Idea . . . " had been produced that

identified a number of the features of the invention that was initially disclosed to the Dougherty & Clements law firm ("the Law Firm") in 2002.

Carter met defendant Emmanuel Ozoeneh in early 2002, when Carter was a customer at the electronics store where Ozoeneh worked. After speaking about Carter's ideas, the two formed Revolutionary Engineering Concepts, Inc. ("REC"), to act as a vehicle to develop and commercialize the invention. Soon after, still in early 2002, they hired the Law Firm to pursue a patent. After subsequent meetings and exchanges between Carter and Ozoeneh (on behalf of REC) and the Law Firm, attorney Jason S. Miller filed a provisional patent application on October 15, 2002, listing both Carter and Ozoeneh as co-inventors.

Several months later, Carter and Ozoeneh met to discuss the progress of invention, and Ozoeneh alleges Carter told him the Law Firm had determined that the invention was not patentable.[1] Thereafter, Carter and Ozoeneh had little or no contact. Soon after this meeting, Carter and others formed Revolutionary Concepts, Inc. ("RCI"). Then, in October 2003, the Law Firm filed U.S. Patent Application No. 10/682,185 ("the non-provisional application") with the United States Patent and Trademark Office on behalf of Carter and without Ozoeneh's knowledge.[2] The non-provisional application eventually matured into the '644 patent, which lists the only inventor as Carter.

Some time thereafter, Carter and RCI filed suit against the Law Firm in state court, alleging malpractice in damaging Carter's and RCI's foreign patent rights by negligently failing to file timely foreign patent applications. That action is currently pending in the North Carolina

---

[1] There is some evidence that both Carter and Ozoeneh received the same letter from the Law Firm communicating as much.

[2] After the Law Firm's efforts did not result in a patent, Carter hired Tillman Wright PLLC to take over the application.

Business Court. Lawyers Mutual Liability Company of North Carolina ("Lawyers Mutual") insures the Law Firm against legal malpractice thus has a financial stake in the state-court action. Pertinent to this federal action, Carter claims that at some point after the state-court litigation ensued, Ozoeneh began making public statements asserting that he is the co-inventor or the sole inventor of the '644 patent's subject matter. Additionally, Ozoeneh retained counsel to inform plaintiffs' counsel of Ozoeneh's intention to sue Carter and RCI on the basis of Ozoeneh's claim of inventorship.

On December 30, 2008, Carter and RCI filed the Complaint in this action against Ozoeneh and seven John Doe defendants seeking declaratory, compensatory, and injunctive relief with respect to the inventorship and ownership of the '644 Patent.[3] Specifically, plaintiffs seek a declaratory judgment to the effect that Ozoeneh is not an inventor or owner of the technology that is the subject of the '644 Patent. Upon discovering that Ozoeneh lacked adequate funds to pay for legal representation, Lawyers Mutual paid attorney Matthew J. Ladenheim to represent Ozoeneh in this action through the summary judgment stage. Plaintiffs, after becoming aware of these payments, amended their complaint to assert claims of tortious interference with contract and maintenance against Miller and Lawyers Mutual, and unfair and deceptive trade practices against Lawyers Mutual alone.

At the close of discovery, the plaintiffs filed a motion for summary judgment as to inventorship, which the Court denied, and a motion for voluntary dismissal without prejudice of their claim for tortious interference with contract, which the court granted. (Doc. Nos. 49 and

---

[3] The Court later dismissed all claims against the John Doe defendants. See (Doc. No. 28).

68). The respective defendants now seek summary judgment as to the plaintiffs' claims for maintenance, unfair and deceptive trade practices, and breach of contract.

**II.     LEGAL STANDARD**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct.

2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

### A. Maintenance (Count IV)

The plaintiffs have asserted a claim of maintenance against both Miller and Lawyers Mutual. The elements of the common law tort of maintenance are (1) officious intermeddling in a suit, (2) which does not belong to the intermeddler, (3) by maintaining or assisting either party with money or otherwise to prosecute or defend it. Smith v. Hartsell, 63 S.E. 172, 174 (N.C. 1908). A claim for maintenance is cognizable only where "the interference is clearly officious and for the purpose of stirring up 'strife and continuing litigation.'" Id. Further, "there is well-considered authority to the effect that assistance of this kind will not be considered officious when one has an interest or acts in the bona fide belief that he has." Id. "[W]here, therefore, a party either has, or honestly believes he has, an interest, either in the subject-matter of the litigation, or in the question to be determined, he may assist in the prosecution or defense of the suit, either by furnishing counsel, or contributing to the expenses . . . ." Id. at 175 (citations omitted).

The plaintiffs have provided no evidence from which a jury could find Miller liable for maintenance. Plaintiffs offer ample argument from counsel on the issue, but no evidence that suggests Miller acted to interfere in this litigation. Miller correctly points out that the only act plaintiffs attribute to Miller is that, prior to the initiation of this action, the "state court defendants in a meeting that included Jason Miller" told Ozoeneh that Carter had told them Ozoeneh had died or gone back to Nigeria and that a "jury could believe that the statement was made to inflame Ozoeneh's anger towards Carter, and therefore be more likely to take action."

(Doc. No. 63 at 7). Such presence at a meeting pre-dating this litigation does not equate to evidence of Miller "maintaining or assisting" Ozoeneh "with money or otherwise to prosecute or defend" this action. Odell v. Legal Bucks, LLC, 665 S.E.2d 767, 773 (N.C. Ct. App. 2008). The only evidence of Miller's involvement in the instant action is his having been named as a defendant, his appearance for his deposition, and his filing of an affidavit. No reasonable jury could find that Miller officiously intermeddled in this litigation, and Miller's motion will be granted as to this claim.

The maintenance claim against Lawyers Mutual raises a slightly more difficult question, as Lawyers Mutual has paid Ozoeneh's legal fees in this action through the summary judgment stage. But plaintiffs still must provide evidence that Lawyers Mutual lacks a bona fide belief that they have an interest in this litigation. Lawyers Mutual has provided sworn testimony that the reason they paid Ozoeneh's legal fees is that they did not want the issue of inventorship to be decided on default judgment in this action, and then applied preclusively against their insured (the Law Firm) in the state court action. See (Doc. No. 51: Graebe Affidavit).

The plaintiffs argue in essence that this reason is disingenuous, because the question of inventorship in this case is independent of the relevant inquiries in the state court action. They point out that the state court action is for legal malpractice, and that the question of standing rests only on whether an agreement for representation existed between the Law Firm and Carter. Plaintiffs further argue that there is ample evidence that Carter was at least a co-inventor, and that a reasonable jury could find from this evidence that Lawyers Mutual lacks a good faith belief that Ozoeneh is the sole inventor. Finally, the plaintiffs point out that by advocating for Ozoeneh through payment of his legal fees, the only goal they are accomplishing other than to intermeddle in this litigation is to create a potential second plaintiff in the state court action for

6

legal malpractice. That is, if Ozoeneh can prove his is an inventor, then he may be able to sue the Law Firm, Lawyers Mutual's insured, for omitting his name from the nonprovisional patent application.

While these points, especially the last, may be interesting to ponder, they are not evidence of maintenance. Whether the outcome of inventorship in this case will in fact impact the state court litigation is not of issue, as there is no evidence that Lawyers Mutual lacked a bona fide belief that it might. Whether a state court will find a federal court's determination of an issue preclusive is often very difficult to predict. In the state court action, whether Ozoeneh is a co-inventor or the sole inventor could certainly affect the issue of damages. If Ozoeneh is determined there to be a co-inventor or the sole inventor, then RCI could be entitled to less damages, if any, from the Law Firm.[4] There is no evidence that Lawyers Mutual acted other than to protect what it perceived was a legitimate business interest.

Furthermore, there is certainly no guarantee Ozoeneh would have a claim for legal malpractice in the state court litigation if he were determined to be a co-inventor or the sole inventor in this litigation. As the plaintiffs point out, a legal malpractice claim first requires the existence of an attorney-client relationship, which Ozoeneh would have to prove. Lawyers Mutual's attempt to protect its perceived interests in the state court litigation by paying Ozoeneh's fees in this case does not create the anomalous reality the plaintiffs wish to paint. The actions of Lawyers Mutual in paying Ozoeneh's legal fees were not "clearly officious," and

---

[4] In addition, there is no evidence Lawyers Mutual lacked an honest belief that the inventorship determination in this case could affect the standing determination in the state court case. While the inventorship result in this litigation may not in the end affect the state court standing determination, no reasonable jury could find Lawyers Mutual lacked a bona fide belief that it could.

no reasonable jury could find they were. Lawyers Mutual's motion for summary judgment will be granted as to the maintenance claim.

B.  **Unfair and Deceptive Trade Practices (Count V)**

To state a claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, a plaintiff must allege three elements: "(1) an unfair or deceptive trade practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant." Nucor Corp. v. Prudential Equity Group, LLC, 659 S.E.2d 483, 488 (N.C. Ct. App. 2008). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Dalton v. Camp, 548 S.E.2d 704, 711 (N.C. 2001).

The plaintiffs tie this claim to their maintenance claim. They contend that "if the jury finds that Lawyers Mutual did not believe that Ozoeneh was the sole inventor on the U.S. patent, then they can also find that engaging in the scheme to represent Ozoeneh, but only for a limited time, while telling this court that they wanted the issue of inventorship decided on the merits, . . . constitutes a business practice that is both unethical and deceptive." (Doc. No. 63 at 17). The Court has already determined there is no evidence Lawyers Mutual lacked a good faith belief that it was protecting a legitimate business interest by paying Ozoeneh's fees. Similarly, there is no evidence that such actions were unethical or unscrupulous, and the Court will grant Lawyers Mutual's motion as to this claim.

C.  **Breach of Contract (Count II)**

The plaintiffs allege Carter and Ozoeneh agreed to sever their business ties in 2003. They further allege that at the time of the agreed dissolution, both parties agreed there were no existing liabilities and that the agreement acted as a contract of mutual release between Carter and Ozoeneh. There is no evidence of a written contract. Plaintiffs argue, however, that a jury

could find from the parties' lack of contact after 2003 that an implied-in-fact contract of mutual release existed.

"A contract implied in fact . . . arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation is implied or presumed from their acts." Revels v. Miss America Organization, 641 S.E.2d 721, 724 (N.C. Ct. App. 2007). "[O]ne looks not to some express agreement, but to the actions of the parties showing an implied offer and acceptance." Id.

By its very nature, the alleged contract in this case is one that requires the parties to end their business relationship, part ways, and forgo any future claims of liability. As evidence of an implied-in-fact contract of dissolution and mutual release, the plaintiffs offer Carter's deposition testimony, where he described the contract as follows: "There was nothing more than he would go his way, and I would go mine." (Doc. No. 62-3 at 5). Carter further states in a sworn declaration that he and Ozoeneh "mutually agreed to part ways, rather than continue to pursue [their company,] REC." (Doc. No. 62-1 at 2). He attests that "to the best of [his] memory" Ozoeneh "agreed to sign" a document Carter prepared stating that neither would pursue REC,[5] and that Ozoeneh agreed orally to the same. (Id. at 3). Finally, the plaintiffs argue that Ozoeneh's counterclaim alleging Carter convinced him to walk away from the project through deception presupposes an "agreement to walk away." (Doc. No. 62 at 7).

Carter's declaration, however, contradicts his earlier deposition testimony admitting there were "no promises" made by either Carter or Ozoeneh to do or refrain from doing anything regarding the alleged dissolution. (Doc. No. 56-3 at 9-11). While at deposition Carter may have

---

[5] Carter was asked at deposition, "Can you swear under oath that a written document was ever created and signed by Mr. Ozoeneh?" He responded, "Could I? Yes, but I wouldn't want to." (Doc. No. 56-3 at 4).

9

described the agreement as "he would go his way, and I would go mine," this vague summary does not create a genuine issue of material fact that Carter and Ozoeneh agreed to release each other from all claims of future liability regarding their enterprise. In addition, while Ozoeneh claims Carter deceptively caused him to walk away from their project, this counterclaim is not evidence that Ozoeneh agreed to release Carter from all future claims.

The only evidence of an implied-in-fact contract is that the parties parted ways and had little or no contact after a presumably failed business venture. Such actions may evidence an implied-in-fact contract of dissolution, but they are inadequate evidence of an implied-in-fact contract of mutual release creating a binding promise not to sue. "It is hard to see what, if anything, [Ozoeneh] could have gained from such a promise." Wolcott v. Ginsburg, 697 F. Supp. 540, 547 (D.D.C. 1988). To hold otherwise would mean that in any case where business partners go separate ways and have little or no contact, and one later sues the other, the matter would necessarily go to trial on a counterclaim for breach of an implied-in-fact contract of mutual release. All on the mere evidence that nothing happened. Such cannot be the law of contracts. No reasonable jury could conclude that a valid contract of mutual release existed. The Court will thus grant Ozoeneh's motion.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Lawyers Mutual's motion for summary judgment (Doc. No. 51) is **GRANTED**;

2. Miller's motion for summary judgment (Doc. No. 53) is **GRANTED**;

3. Ozoeneh's motion for summary judgment regarding plaintiffs' breach of contract claim is **GRANTED**; and

4. This matter is set for jury trial on November 15, 2010, as to the remaining claim.

SO ORDERED.

Signed: October 15, 2010

Robert J. Conrad, Jr.
Chief United States District Judge